# In the United States Court of Federal Claims

No. 25-216
(Filed:  18 December 2025)*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| VINSYS IT HUB LLC, | * |
|  | * |
| Plaintiff, | * |
|  | * |
| v. | * |
|  | * |
| THE UNITED STATES, | * |
|  | * |
| Defendant. | * |
|  | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Lewis P. Rhodes*, of Reston Law Group LLP, with whom was *Thomas K. David*, all of Reston, VA, for plaintiff.

*Russell J. Upton*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Yaakov M. Roth*, Acting Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Deborah A. Bynum*, Assistant Director, and *Caitlin J. Kelly*, of the Small Business Administration, all of Washington, DC, and *Jon Gottschalk* of the United States Department of Health and Human Services of Rockville, MD, for defendant.

## OPINION AND ORDER

**HOLTE, Judge.**

Plaintiff Vinsys IT Hub LLC, a Small Business Administration 8(a) company providing IT services, files this protest against the National Institute of Health's National Library of Medicine.  From 2019 to 2024, the National Library of Medicine procured IT services under the STARS II Governmentwide Acquisition Contract vehicle for 8(a) set-aside programs.  Near the end of the contract term, the agency recompeted another IT services contract under a new solicitation, but unlike the previous IT contract, the new solicitation was not an 8(a) set-aside.  Plaintiff now protests the removal of the new IT services contract from the 8(a) set-aside program.  Before the Court are the parties' cross-motions for judgment on the administrative record.  Vinsys contends NLM needed to secure the Small Business Administration's concurrence before removing a contract from the 8(a) set aside program, whereas the

---

* This Opinion was originally filed under seal on 8 December 2025 pursuant to the protective order in this case.  The Court provided the parties an opportunity to review this Opinion for any proprietary, confidential, or other protected information and submit proposed redactions by 15 December 2025 at 5:00 p.m. (ET).  The parties did not provide redactions.  This Opinion is now reissued publicly in its original form.

government argues NLM properly deemed the solicitation a new contract and only needed to provide written notification to the Small Business Administration under the controlling regulation. As NLM provided written notification to the SBA and, *inter alia*, submitted a sixteen-page memorandum detailing why the agency deemed the new solicitation a new requirement, NLM complied with the controlling regulation and did not act arbitrarily and capriciously in removing the new solicitation from the 8(a) program. For the following reasons, the Court denies plaintiff's motion for judgment on the administrative record and grants the government's cross-motion for judgment on the administrative record.

## I.    Factual Background

### A.    Requirement History

In 2019, the National Institute of Health's National Library of Medicine ("NLM") issued a solicitation titled "Software Development, Automation, and Maintenance to Support Health Care, Biomedical Vocabularies, and Standards for the NLM's [Office of Computer and Communications Systems ("OCCS")]," which was competed under General Services Administration ("GSA")'s 8(a) STARS II Governmentwide Acquisition Contract vehicle. *See* Admin. R. ("AR") Tab 27f at 1048 (Statement of Work for the 2019 Solicitation). The 8(a) STARS II allows direct task orders to 8(a) eligible small businesses for "flexible access to IT services and customized IT services-based solutions from a large, diverse pool of 8(a) industry partners." *GSA Increases Ceiling for 8(a) STARS II Contract*, (Jun. 24, 2020), https://www.gsa.gov/about-us/newsroom/news-releases/gsa-increases-ceiling-for-8a-stars-ii-contract-06242020. NLM awarded the task order from the 2019 solicitation to Software Consultants, Inc. with a period of performance of 20 September 2019 through 19 September 2024 and was subsequently followed by a bridge contract[1], extending the period of performance to provide "continuity of services for NLM critical and mission-critical applications" while the contracting office worked on a re-procurement after the bid protest and corrective action. AR Tab 41c at 1575–77 (NLM's Determinations and Findings ("D&F"), New Requirement Designation ("NRD")); Tr. at 12:12–25 ("[GOVERNMENT:] [T]here was only one actual contract that was predecessor, the one awarded in 2019, and I believe that's been extended or bridged or otherwise pending the protests.").

### B.    NLM's Solicitation and Plaintiff's GAO Bid Protest

On 14 August 2024, as the predecessor task order neared expiration, NLM issued 1703802, entitled "Software Development, Automation, and Maintenance (NLM) (OCCS)" with a period of performance from 20 September 2024 through 19 September 2029. AR Tab 14 at 814 (Cover Page of RFQ 1703802). Unlike its predecessor, however, the new solicitation was issued as a general small business set-aside, not under the 8(a) program or the new STARS III contract vehicle. AR Tab 14 at 814 (Cover Page of RFQ 1703802). RFQ 1703802's Statement of Work contains requirements for "software development, operations, maintenance, and other related continuing and recurring tasks" to support "OCCS activities in application development,

---

[1] The incumbent contractor is still providing services to OCCS under the bridge contract and is expected to continue during the pendency of this bid protest until a new contract is awarded. Pl.'s Motion for Judgment on the Administrative Record ("MJAR") at 10, ECF No. 14; *see also* Tr. at 107:15–109:6.

healthcare standards, terminologies, medical vocabulary control processing, cloud computing, customer experience support, and information dissemination." AR Tab 27g at 1097 (Statement of Work for 2024 Solicitation).

On 28 August 2024, plaintiff, alongside its joint-venture partner Shipli Associates LLC, filed a pre-award bid protest with the GAO, alleging NLM "ha[d] improperly removed an ongoing requirement for software development, automation and maintenance from the SBA's 8(a) program." AR Tab 20 at 979 (Docket Sheet for GAO Protest B-422876.1). Plaintiff alleged NLM violated FAR 19.815 by removing the opportunity from the 8(a) program and instead issuing the solicitation under a general small business set-aside. AR Tab 20 at 979–80 (Docket Sheet for GAO Protest B-422876.1). Plaintiff claimed NLM failed to submit a written request to SBA and receive approval to remove the requirement from the 8(a) program, as is required under FAR 19.815, and requested GAO sustain the protest and find "the Solicitation is a follow-on requirement and must be solicited through the 8(a) program. AR Tab 21 at 980, 985 (Vinsys Preaward GAO Protest).

On 6 September 2024, the National Institute of Health ("NIH") issued plaintiff a letter, stating the agency decided to take voluntary corrective actions in response to the GAO protest. AR Tab 23 at 999 (NLM's Notice of Voluntary Corrective Action and Request for Dismissal). The agency agreed to "[c]ancel the solicitation to coordinate with [SBA] about th[e] requirement" and "reissue a solicitation based on the SBA's determination." *Id*. NIH then requested GAO dismiss the protest without costs "because this corrective action renders this protest academic" and "the agency has taken corrective action prior to the date required to submit its report." *Id*. On 11 September 2024, GAO agreed plaintiff's protest was "academic based on the agency's proposed corrective action," and dismissed the protest. AR Tab 25 at 1002 (GAO Dismissal of Protest as Academic).

### C.    NLM's Coordination with SBA

On 11 October 2024, NLM submitted a "Request to release requirement for non-8(a) competition" to SBA. AR Tab 27a at 1005 (NLM's 11 October 2024 8a Program Release Request). NLM stated the reason for its request was "due to the scope of the requirement changing and increasing," and their market research "only found one 8(a) vendor, but a number of small businesses, with demonstrated complete capability of performing all aspects of the requirement." *Id*. During its market research, NLM found "[s]even small businesses were deemed to have complete capability to address the subject requirement[, but] only one was an 8(a)." AR Tab 27a at 1006 (NLM's 11 October 2024 8a Program Release Request). NLM noted the incumbent contractor, Software Consultants, Inc., "has complete capability" and was previously an 8(a) small business, but "graduated from the program on July 11, 2011" although it "remained on the GSA STARS II contract vehicle until it ended on August 30, 2024." *Id*. NLM determined "recompeting under the new GSA 8(a) STARS III vehicle is not in the government's best interest" because "there are fewer than two capable 8(a) small businesses able to meet specific project requirements." AR Tab 27a at 1013 (NLM's 11 October 2024 8a Program Release Request). If NLM's request to release the requirement from 8(a) is approved, the requirement "would still be competed as a small business set aside." *Id*.

On 29 October 2024, an SBA Washington Metropolitan Area District supervisor assigned the release request to an SBA Business Opportunity Specialist to review. AR Tab 38c at 1339–40 (Email from SBA to NLM on 29 October 2024 at 3:43 p.m. with subject line "8(a) Program Release Request – 'Software Development, Operation, Maintenance, and Cloud Computing to Support'"). While this request was pending with SBA, NLM internally discussed whether the solicitation was a new requirement, and after correspondences and calls with HHS employees, the Contracting Officer issued a Determinations & Findings ("D&F") memorandum on 27 November 2024. AR Tab 41c at 1574–89 (NLM's 27 November 2024 D&F NRD). NLM sent the D&F and supporting documentation to SBA on 6 December 2024. *See* AR Tab 41 at 1464–65 (Email from NLM to SBA on 10 December 2024 at 2:51 p.m. with subject line "8(a) Program Release Request – 'Software Development, Operation, Maintenance, and Cloud Computing to Support'").

On 10 December 2024, after internal NLM discussions finding that the New Requirement Determination request "fit [NLM's] procurement the best," the NLM contracting officer notified SBA to withdraw the 8(a) Release Request, leaving only the NRD request submitted on 6 December 2024, and promised to follow up "to discuss further." AR Tab 41d at 1596, 1598 (emails between NLM and SBA on 10 & 11 December 2024 with subject line "8(a) Program Release Request – 'Software Development, Operation, Maintenance, and Cloud Computing to Support'"). On 19 December 2024, upon request from SBA, NLM re-submitted the NRD request for SBA processing and distinguished this request from the withdrawn 8(a) release request. AR Tab 41d at 1590–95 (emails between NLM and SBA on 10–20 December 2024 showing confusion about the two requests).

On 20 December 2024, the SBA Washington Metropolitan Area District Office Deputy director replied to NLM's email clarifying the NRD request stating, "[y]es, we consider this a new contract and a release is not required." AR Tab 41d at 1590 (Email from SBA to NLM on 20 December at 1:46 p.m.). Then, on 16 January 2025, NLM reissued the solicitation as RFQ 1740009 with some minor modifications, and as the SBA replied to NLM's email agreeing with the new requirement determination, NLM did not reissue the solicitation as an 8(a) set-aside contract. AR Tab 39 at 1345. Plaintiff, after noticing NLM again resolicited the contract outside the 8(a) set-aside program, filed its Complaint—this time in this court—alleging SBA did not complete a proper analysis comparing the predecessor SOW with the new SOW before considering the RFQ a new requirement. Compl. ¶ 1.

After plaintiff filed its Complaint, on 7 February 2025, SBA's Washington District Office supervisor sent an email to the SBA employee who had been tasked to review NLM's 8(a) release request, asking the employee to "review the old and new SOWs to determine if [the requirement] is new." AR Tab 41 at 1456 (Email from SBA Supervisory Business Opportunity Specialist to two Business Opportunity Specialists on 7 February 2025). The supervisor noted "[it] looks like the review was not done for this one." *Id.*

A few months after plaintiff filed its Complaint, the government compiled the Administrative Record, *see* Notice of Filing AR, ECF No. 12, and on 8 April 2025, plaintiff moved for judgment on the administrative record. *See* Pl.'s Mot. for Judgment on the AR ("MJAR"), ECF No. 14. The government, on 13 May 2025, filed its cross-MJAR and responded

to plaintiff's MJAR.  *See* Gov't's Cross-MJAR, ECF No. 17.  Then, on 3 June 2025, Plaintiff filed a reply in support of its MJAR and a response to the government's cross-MJAR, *see* Pl.'s Reply, ECF No. 21, and the government filed its reply in support of its cross-MJAR on 23 June 2025, *see* Gov't's Reply, ECF No. 23.  The Court held oral argument on the parties' MJARs on 4 September 2025.  *See* 29 August 2025 Scheduling Order, ECF No. 26.

## II.    Parties' Arguments

Vinsys moved for Judgment on the Administrative Record in this "very simple protest," asking this Court to determine (1) "that NLM improperly removed a requirement from the 8(a) Program," and (2) "that SBA failed to conduct any meaningful analysis on whether the RFQ 1740009 is a 'new requirement' or a 'follow on' contract."  Pl.'s MJAR at 1–2.  First, Vinsys argues "the bottom line is that there is no evidence that the SBA actually reviewed the information provided by NLM" as required by 13 C.F.R. § 124.504(d).  Pl.'s Reply at 2.  Vinsys argues SBA is "the gate-keeper of the 8(a) program," and although NLM was required to coordinate with SBA to remove an opportunity out of the 8(a) program, this coordination never occurred.  Pl.'s MJAR at 2.  Vinsys avers, "the first time [NLM] deemed the Solicitation as a 'new requirement' was after it [k]new this was the requirement to remove the contract from the 8(a) program."  *Id.* at 3.  In other words, Vinsys claims once NLM learned "that [deeming the solicitation as a new requirement] was the requirement to remove the opportunity from the 8(a) program," Vinsys argues "[o]nly then did [NLM] decide that this was a new requirement."  *Id.* at 2.  To coordinate with SBA after the GAO protest, NLM also "prepared a package to the SBA to review to get approval to remove the Solicitation from the 8(a) program," but SBA was "confused by the request, was unsure of the process, or had significant delays in responding back to NLM."  *Id.* at 4.  Vinsys suggests Mr. Carlisle's supervisor—Ms. Mackin—"clearly demonstrat[ed] her confusion over NLM's request" by instructing NLM on "how to request the review," and after NLM clarified its request "[a]fter hours on the 19th, . . . [s]omehow, by the next afternoon, the SBA conducted a review and made its determination on "[t]he Friday before Christmas."  Pl.'s Reply at 2.  Vinsys asserts "Ms. Mackin's email was an attempt to close something out before the Holidays."  *Id.*

In addition to the alleged lack of evidence suggesting SBA reviewed NLM's request, Vinsys also argues "Defendant's interpretation of [13 C.F.R. 124.504(d)] [allows] any agency [to] unilaterally remove a contract from the 8(a) program at any time by construing it as a new opportunity."  Pl.'s Reply at 4.  Demonstrated by SBA's "fail[ure] to conduct any reasoned analysis" which is "the entire issue in this protest," SBA—the "steward" for ensuring other agencies comply with 8(a) regulations—"completely abdicated this responsibility, and the Court should require an actual analysis from the SBA."  *Id.* at 6.  As a result, Vinsys, relying on 13 C.F.R. 124.504(d), insists SBA must be expressly approve every request to remove a procurement from the 8(a) set aside, and given SBA did not provide an express approval with a reasoned decision, Vinsys argues NLM improperly removed the solicitation from the 8(a) set-aside program without SBA's express approval.  *See* Pl.'s Reply at 4–6.

Second, Vinsys insists the solicitation is not a new requirement, and SBA failed to analyze whether NLM properly deem it a new requirement.  *See* Pl.'s MJAR at 8–9.  In its support, Vinsys argues "[n]ot only are [the solicitations'] titles similar, so is the scope of the

work." *Id.* at 3. For example, the solicitation at issue in this protest is titled (in relevant part) "Software Development, Operation, Maintenance, and Cloud Computing to Support Health Care Standards, Terminologies, and Customer Experience," whereas the previous project's title was "Software Development, Automation, and Maintenance to Support Health Care, Biomedical Vocabularies and Standards." *Id.* Vinsys argues, as further evidence of the solicitations' similarities, "NLM agreed with the similarity in the two solicitations until October[] 2024." *Id.* Vinsys also points to NLM's July 2024 Acquisition Plan in support of its argument NLM did not "indicate on any level that this current Solicitation is a new requirement or materially different from the predecessor contract." *Id.* Vinsys maintains "[a]t no point during the acquisition planning did NLM indicate on any level that this current Solicitation is a new requirement or materially different from the predecessor contracts," because "[i]f NLM really viewed the Solicitation as a 'new requirement,' it would have designated it as such during the initial acquisition planning." *Id.* at 3–4.

Vinsys claims NLM deemed the solicitation as a new requirement because NLM learned it could remove the solicitation from the 8(a) set aside by deeming it as such. *See* Pl.'s MJAR at 3–4. As evidence, Vinsys asks the Court to view the acquisition planning documents as the "well-reasoned position of the agency, . . . as these documents show, at that time, NLM did not deem the Solicitation as a "new requirement." *Id.* at 9. "The analysis conducted by NLM in October 2024," on the other hand, "should not be viewed as a reasoned agency decision:" according to Vinsys, the October 2024 "'analysis' should be deemed more akin to a litigation position" and afforded no deference because NLM "solely seeks 'to advance its litigating position.'" *Id.* Vinsys proclaims NLM "was writing to the answer of the test" by deeming the Solicitation as a new "requirement." *Id.* By "push[ing] on with the solicitation despite being notified by Vinsys counsel that it was violating the SBA regulations," Vinsys alleges NLM was pursuing its "goal . . . to issue the Solicitation in a manner where the current incumbent could bid on it." *Id.* at 8–9.

The government argues it is entitled to judgment on the administrative record because plaintiff "cannot establish 'a clear prejudicial violation' of the FAR or SBA regulations, or that NLM's and/or SBA's actions 'lacked a rational basis.'" Gov't's MJAR at 16. The government maintains the RFQ at issue is a "new requirement"—not a "follow-on" requirement to the previous requirement—thus the government argues NLM does not require an SBA Release. *Id.* at 25–27. The government contends SBA concurred with this position after receiving and reviewing NLM's submission. *Id.* at 27–28. As such, the government asserts neither NLM nor SBA acted arbitrarily or capriciously, or otherwise in violation of the FAR or SBA regulations in this procurement because pursuant to 13 C.F.R. § 124.504(d)(1): (1) the procuring agency creates the new requirement determination, not SBA; (2) SBA properly relied upon the procuring agency's determinations; and (3) SBA concurred on the procuring agency's determination. *Id.* at 13–14. Accordingly, the government maintains NLM and SBA did not violate the FAR or SBA regulations and their actions were not arbitrary and capricious. *Id.*

## III.    Legal Standards

### A.    Bid Protest Jurisdiction and APA Standard of Review

The Tucker Act, as amended by the Administrative Dispute Resolution Act ("ADRA"), provides this court jurisdiction over "action[s] by an interested party objecting to a solicitation by a federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." Administrative Dispute Resolution Act, Pub. L. No. 104-320, 28 U.S.C. § 1491(b)(1) (1996). The term "interested party" means "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Am. Fed'n of Gov't Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001). "[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996).

The Court evaluates bid protests under the framework laid out in Section 706 of the Administrative Procedure Act. 28 U.S.C. § 1491(b)(4); *see also Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001); MATTHEW H. SOLOMSON, COURT OF FEDERAL CLAIMS: JURISDICTION, PRACTICE, AND PROCEDURE § 8-37 (2016) (footnote omitted) (first citing 28 U.S.C. § 1491(b)(4); and then quoting 5 U.S.C. § 706(A), (D)); 28 U.S.C. § 1491(b)(4) (2024) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5.")). "[T]he proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A): a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350–51 (Fed. Cir. 2004) (quoting *Adv. Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (Fed. Cir. 2000)). An agency's action is arbitrary, capricious, or an abuse of discretion if "the agency 'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or . . . is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). As the arbitrary and capricious standard is "highly deferential," a reviewing court must "sustain an agency action evincing rational reasoning and consideration of relevant factors." *Adv. Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)). A court, therefore, will not "substitute its judgment" for the agency's so long as the agency's decision was reasonable. *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 998–99 (Fed. Cir. 2018) (quoting *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003)).

**B.    Judgment on the Administrative Record in a Bid Protest**

"[RCFC] 52.1(c) provides for judgment on the administrative record." *Huntsville Times Co. v. United States*, 98 Fed. Cl. 100, 104 (2011); *see also Bannum*, 404 F.3d at 1353–54. The court may set aside an agency action if plaintiff has proven "either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa*, 238 F.3d at 1332. The rational basis test requires the court to ask "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Dell Fed. Sys., L.P.*, 906 F.3d at 992 (quoting *Banknote*, 365 F.3d at

1351).  "When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'"  *Impresa*, 238 F.3d at 1333 (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).  "*[D]e minimis* errors do not require the overturning of an award."  *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 1000 (Fed. Cir. 1996).  A bid protest plaintiff must establish alleged "errors in the procurement process significantly prejudiced" plaintiff by showing "there was a 'substantial chance' it would have received the contract award but for the errors."  *Bannum*, 404 F.3d at 1353 (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).

## IV.    Whether NLM Complied With 13 C.F.R § 124.504 By Providing Written Notification of NLM's New Requirement Determination To SBA

At oral argument, plaintiff clarified this protest is based on one argument:  whether "the SBA needed to do some sort of analysis on whether or not the [NRD] was correct" in removing the solicitation from the 8(a) program based on the new requirement determination.  Tr. at 23:13–15; *see also* Tr. at 22:19–23:1 ("[THE COURT]: [T]o summarize Plaintiff's argument, Plaintiff's only argument is that the SBA did not thoroughly weigh in on the NRD?  [PLAINTIFF]: Correct, Your Honor.  THE COURT: And that's the only argument?  [PLAINTIFF]: Substantively, yes, that's the only real legal argument to this protest.").

13 C.F.R. § 124.504 controls the procedure to remove a solicitation from the 8(a) set-aside program, and 13 C.F.R § 124.3 defines follow-on and new requirements.  *See* Pl.'s MJAR at 6–7; Gov't's MJAR at 20–21.  Given plaintiff's protest relies on the procedure of removing solicitations from the 8(a) program based on a new requirement determination, the Court determines whether NLM and SBA complied with 13 C.F.R. § 124.504 by first reviewing controlling regulations and duties imposed on each agency, and then evaluates whether the correspondences between the agencies fulfilled their duties under the controlling regulations.

### A.    Whether Section § 124.504(d)(1) Requires Written Notification to SBA or SBA's Concurrence For New Requirement Contracts

The parties disagree on the level of SBA's involvement required under 13 C.F.R. § 124.504(d)(1).  Vinsys argues the Solicitation is a follow-on requirement, and therefore the regulations require SBA to approve NLM's removal of the solicitation from the 8(a) program.  Pl.'s MJAR at 7.  Of the three conditions used to determine whether a particular requirement or contract is a follow-on, Vinsys argues "[n]one of the[m] apply to the Solicitation, making it a follow-on requirement."  Pl.'s Reply at 7.  As a result, "only the SBA can decide to release the follow-on work from the 8(a) program" and even "[i]f an agency determines that the re-compete is a new requirement, it still must coordinate with and seek approval from the SBA."  *Id.*  This coordination between the procuring agency and SBA requires, according to plaintiff, SBA to "concur" and provide a "reasoned decision" after conducting an analysis of the procuring agency's determination.  *See* Tr. at 32:2–14.  Vinsys also contends "under [d]efendant's interpretation of [13 C.F.R. § 124.504(d),] any agency can unilaterally remove a contract from the 8(a) program at any time by construing it as a new opportunity."  Pl.'s Reply at 4.  Vinsys also states "[l]ogically[,] the only reason to provide this information to the SBA is so that the

SBA could review the agency's determination for approval or denial," and "[g]iven the SBA's role in every 8(a) contract, the only potential interpretation of this regulation is that the SBA must concur in all efforts to remove any work from the 8(a) program." *Id.* at 5.

The government argues "SBA's concurrence is not required for the procuring agency to proceed with a 'new requirement.'" Gov't's MJAR at 23. According to the government, "the regulations contemplate the SBA employing the appeals process to address a procuring agency's new requirement determination with which SBA disagrees," and "where SBA is not dissenting, the SBA may rely upon the 'new requirement' analysis that the procuring agency 'submit[s as] a written notice' to SBA." *Id.* at 23 (citing FAR § 19.815(d)(1)). According to the government, because the solicitation was "a 'new requirement' and not a 'follow-on' requirement, NLM did not need to obtain from SBA a release from the 8(a) Program," and only needed to "'coordinate' with SBA that [NLM] was going to conduct the procurement outside of the 8(a) Program through a requirement it considered to be new . . . with SBA given the opportunity to review and 'supply input.'" *Id.* at 26–27 (citing 13 C.F.R. § 124.504(d)(1); 13 C.F.R. § 124.3; 85 Fed. Reg. 66188).

To analyze the agencies' obligations, the Court first examines 13 C.F.R. § 124.504. In its title, § 124.504 discusses two items: (1) "[w]hat circumstances limit SBA's ability to accept a procurement for award as an 8(a) contract"; and (2) "when can a requirement be released from the 8(a) BD program?" Subsections (a) through (c) of § 124.504 discuss instances limiting SBA's ability to award a contract as an 8(a) set-aside, whereas subsection (d) discusses "Release for non-8(a) or limited 8(a) competition." Given this protest concerns the release of NLM's contract from the 8(a) program, the Court narrows in on subsection (d). Of the four sub-subsections of § 124.504(d), the parties agree sub-subsection (1) discusses the situations related to SBA's involvement related to removing contracts from the 8(a) program. *See* Tr. at 29:10–23; Pl.'s MJAR at 6–7; Gov't's MJAR at 20–21.

Section 124.504(d) entangles three independent requirements in one paragraph, so the Court dissects subsection (d)(1) into the three sections. First, the regulation requires follow-on solicitations to remain in the 8(a) program if the previous procurement was in the 8(a) program, unless SBA explicitly agrees to release the procurement from the 8(a) program:

> [W]here a procurement is awarded as an 8(a) contract, its *follow-on requirement* must remain in the 8(a) BD program *unless SBA agrees to release it* for non-8(a) competition.

13 C.F.R. § 124.504(d)(1). Second, the regulation confers two responsibilities to the procuring agency for new requirements: (i) it establishes the procuring agency as the party responsible for determining whether the solicitation is a new requirement—not SBA; and (ii) if the agency deems a solicitation is a new requirement, then the agency must *coordinate* with and *notify* the SBA with the scope and dollar value of the task orders under the solicitation and the previous procurement (which was an 8(a) set-aside):

> Where a procurement will contain work currently performed under one or more 8(a) contracts, and the *procuring agency determines* that the procurement should

*not be considered a follow-on requirement* to the 8(a) contract(s), the procuring agency must *coordinate* with the SBA District Office servicing the 8(a) incumbent firm and the SBA Procurement Center Representative assigned to the contracting activity initiating a non-8(a) procurement action that it intends to procure such specified work outside the 8(a) BD program through a requirement that it considers to be new. *Such notification* must identify the scope and dollar value of any work previously performed through another 8(a) contract and the scope and dollar value of the contract determined to be new.

13 C.F.R. § 124.504(d)(1). Third, if the agency wants to reprocure a follow-on contract outside the 8(a) program, before the agency removes the solicitation from the 8(a) program (or use a contracting vehicle different from the previous procurement), the agency must (1) coordinate with SBA; (2) make a written request; and (3) receive SBA's concurrence:

> [A] procuring agency must coordinate with SBA where it seeks to reprocure a follow-on requirement through a pre-existing limited contracting vehicle which is not available to all 8(a) BD Program Participants and the previous/current 8(a) award was not so limited. If a procuring agency would like to fulfill a follow-on requirement outside of the 8(a) BD program, it must make a written request to and receive the concurrence of the AA/BD to do so.

13 C.F.R. § 124.504(d)(1). Based on the plain language of 13 C.F.R. § 124.504(d)(1), once a procuring agency deems a solicitation as a new requirement, the procuring agency must only "coordinate" with SBA in providing a "written notification" identifying the previous procurement and the solicitation's task orders and dollar values. While the procuring agency need only "coordinate" and provide "written notification" for new requirements, for follow-on contracts, the regulation mandates a heightened requirement: the procuring agency must "coordinate," make a "written request," and receive the "concurrence" from SBA. 13 C.F.R. § 124.504(d)(1).

Given both provisions require the procuring agency to "coordinate," the difference between "notification" (as required for new requirements), and "request" and "concurrence" (as required for follow-on contracts) represent the two levels of SBA's involvement. As noted in 13 C.F.R. § 124.504(d)(1), the notification must only "identify" the scope and dollar value of the previous procurement and the solicitation. There is no requirement—or mention—of a request or concurrence in this component. *See id.* To contrast, a "written request" comprises "the act or an instance of asking for something." *See* Request, *Merriam Webster Dictionary*, https://www.merriam-webster.com/dictionary/request. The regulation continues to require the procuring agency to "receive the concurrence of the [SBA]." According to the "definition of 'concurrence' . . . from Merriam-Webster [Dictionary]," concur means "'an agreement in opinion or design, agreement in union or action,' . . . and the example Merriam-Webster gives is 'obtain the written concurrence of the Attorney General.'" Tr. at 33:11–17 (citing Concurrence, *Merriam Webster Dictionary*, https://www.merriam-webster.com/dictionary/concurrence). When asked at oral argument about the meaning of concurrence, plaintiff stated it "believe[s] concurrence necessarily means that you have to at least analyze something to concur with it . . . [and provide] some sort of reasoned decision made by the SBA," because it is "assumed in

the fact that the SBA can't concur with the agency's decision if [SBA] do[es]n't review the agency's decision substantively to figure out whether or not it's worth concurring with." Tr. at 32:2–14. After the Court read the Merriam-Webster definition of "concurrence" and asked plaintiff whether "concur" means "agreement with the conclusion," plaintiff stated "[y]es, a concurrence means I agree" with "some sort of detail" "reflective of whether or not [SBA] actually examined this." Tr. at 33:7–34:9. Plaintiff also acknowledged the concurrence "could [be] one sentence." Tr. at 34:15–21.

       Contextualizing the requirement of "written request" with "concurrence" in § 124.504(d)(1), for a follow-on contract the procuring agency must: (1) ask whether SBA agrees with the procuring agency in writing and (2) receive a statement that SBA agrees. This comports with the first component of § 124.504(d)(1) requiring express SBA approval before removing a follow-on contract from the 8(a) program, but not requiring a similar approval for new requirements. *See* 13 C.F.R. § 124.504(d)(1) ("[W]here a procurement is awarded as an 8(a) contract, its *follow-on requirement* must remain in the 8(a) BD program unless SBA agrees to release it for non-8(a) competition.") (emphasis added). The parties agree the regulation demands less involvement from SBA for new requirements when compared against follow-on requirements. Tr. at 88:21–89:4 ("[THE COURT:] I think what the Government's suggesting is that coordinate and notification is even less than release and concurrence, correct? [GOVERNMENT]: That is correct, Your Honor. THE COURT: Yeah. And you agree with that disagreement? [PLAINTIFF]: I agree that it is a lower requirement than a straight-up follow-on."). Accordingly, the Court interprets § 124.504(d)(1) as requiring two different levels of involvement based on whether a solicitation is either a follow-on contract or a new requirement: (1) if a solicitation is a follow-on contract, the procuring agency must ask whether SBA agrees with the procuring agency in writing (*i.e.*, "written request") and receive a statement showing SBA's agreement (*i.e.*, "concurrence"); and (2) if a solicitation is a new requirement, the procuring agency must only "coordinate" with SBA and provide SBA with a "written notification" identifying the previous procurement and the solicitation's task orders and dollar values.

       The Court's interpretation of Section 124.504(d)(1) is consistent with its related FAR provisions and rule-making notices. For example, FAR § 19.815 (titled Release and notification requirements for non-8(a) procurement) details requirements to release procurements from the 8(a) program identical to those in Section 124.504(d)(1). First, the FAR requires:

       Once a requirement has been accepted by SBA into the 8(a) program, any follow-on
       requirements (see definition at 13 C.F.R. 124.3) shall remain in the 8(a) program
       unless[] SBA agrees to release the requirement from the 8(a) program for a
       follow-on, non-8(a) procurement.

FAR § 19.815(a). The FAR, like the first component of Section 124.504(d)(1), also requires "the contracting officer [from the procuring agency] [to] make a written request to, and receive concurrence from, the SBA Associate Administrator for Business Development" to obtain release for a follow-on procurement. FAR § 19.815(b); *see also* FAR § 19.815(c) (describing the requirements for the written request). Then, the FAR—like 13 C.F.R. § 124.504(d)(1) confirms

the procuring agency (and specifically, the contracting officer) is responsible for determining whether a solicitation is a new requirement or a follow-on requirement:

> When a contracting officer decides that a requirement previously procured under the 8(a) program is a new requirement and not a follow-on requirement to an 8(a) contract(s) . . .

The FAR, lastly, reaffirms the elevated requirements for follow-on contracts as compared to new requirements:

> [T]he contracting officer shall *coordinate* with and *submit a written notice* to the SBA District Office servicing the 8(a) incumbent firm and to the SBA procurement center representative . . . .

FAR § 19.815(d)(1); *see also* FAR § 19.815(d)(2) (describing the requirements for the written notice). A final example confirms the Court's interpretation of 13 C.F.R. § 124.504(d)(1), 85 Fed. Reg. 66188: the proposed rulemaking notice for FAR § 19.815 requires "[a] contracting officer [to] make the determination as to whether a requirement is new, but SBA should be given the opportunity to look at the procuring activity's strategy and *supply input where appropriate*." Consolidation of Mentor-Protege Programs and Other Government Contracting Amendments, 85 Fed. Reg. 66146, 66155 (Oct. 16, 2020) (emphasis added). This rulemaking notice is comprised of two parts. First, FAR § 19.815, like the first component of Section 124.504(d)(1), vests the "determination as to whether a requirement is new" in a contracting officer at the procuring agency. *Accord* 13 C.F.R. § 124.504(d)(1) ("the procuring agency determines that the procurement should not be considered a follow-on requirement to the 8(a) contract(s)"). Second, § 19.815 requires SBA to have the opportunity to look and provide input (where appropriate) on the procuring agency's decision[2]—equivalent to 13 C.F.R. § 124.504(d)(1) requiring the procuring agency to "coordinate" with SBA. Given FAR § 19.815 mirrors the structure of 13 C.F.R. § 124.504(d)(1), all controlling regulations dovetail to solely require "coordination" with and submission of a "written notification" to SBA when a procuring agency deems a solicitation a new requirement—rather than the heightened standard of requiring SBA's "concurrence" for follow-on contracts.

## B.  Whether NLM's Email to SBA With NLM's D&F Satisfies Written Notification Under 13 C.F.R § 124.504

Plaintiff argues SBA was required to concur with NLM's determination and provide a reasoned decision detailing SBA's analysis. Vinsys admits "NLM sought [an] approval, but the

---

[2] In reference to the "supply input where appropriate" clause of FAR § 19.815, SBA employs a separate process for appealing a procuring agency's decision, which allows SBA to "supply input" when, for example, it disagrees with a procuring agency's decision to remove a program from the 8(a) program or deem a solicitation as a new requirement. *See* Tr. at 42:20–23 ("[GOVERNMENT:]  [I]f we get into the disagreement, . . . that takes us over to 505(a) and the coverage you get through the appeal process."), 81:9–13 ("[PLAINTIFF:]  [W]e referred to 504 a couple of times in the SBA's process of appealing these things. The SBA has the process of a hammer if they disagree with you taking it out of the 8(a) program"), 91:22–25 ([PLAINTIFF:]  [T]he implied hammer to this process is if the SBA disagrees with you and you're going to take it out anyway, then you go under [§] 505, and the SBA can appeal this process.").

SBA failed to actually review the documentation and make a reasoned decision," and "at best, the SBA provided no rationale for its alleged concurrence." Pl.'s MJAR at 8. Vinsys also concedes there is a one-sentence email labeled "SBA Concurrence" in the record, but declares "[t]here is not one single document in this record showing that the SBA conducted any analysis." *Id.* at 2. Vinsys argues the "'SBA Concurrence[]' . . . email is contradicted by another email from the SBA." *Id.* Specifically, Vinsys avers there are two relevant chains: both chains originate with NLM's original package for approval and include an email stating Mr. George Carlisle was responsible for conducting a review of the package, but both diverge on 19 December 2024. *See id.* In the first chain, Ms. Shuraie Mackin of SBA—not Mr. George Carlisle—responded to NLM's question of whether SBA agrees with NLM's determination that the solicitation is a new requirement, stating "Yes, we consider this a new contract and a release is not required." AR Tab 38c at 1329 (Email from NLM/HHS to NIH on 20 December 2024 at 3:58 p.m. forwarding SBA's 20 December email to NIH)). Vinsys claims "[t]here is no document in the record showing Mr. Carlisle's concurrence or reflecting his analysis," nor is there anything "in the file that shows that Ms. Mackin actually reviewed NLM's request." Pl.'s MJAR at 5. A few months later, on 7 February 2025, a different SBA employee emailed Mr. Carlisle, asking him "to review the old and the new SOWs to determine if this is new. This looks like the review was not done for this one. Start this review today." AR Tab 41 at 1456 (Emails from SBA Supervisory Business Opportunity Specialist to Business Opportunity Specialists on 7 February 2025 at 11:10 a.m. and 2:20 p.m.)). Vinsys contends this email shows "SBA realized it never actually conducted the required analysis in December 2024": "the reason Ms. Mackin's email has no supporting rationale is because the SBA never actually reviewed and analyzed the Solicitation." Pl.'s MJAR at 5, 8. Given "Ms. Mackin was not the individual tasked with conducting this review" and "[the] broad, general statement from Ms. Mackin contains no analysis or examination," Vinsys states the email "should, on its face, be deemed unreasonable" and "contrary to law." *Id.* at 8.

Vinsys maintains all involved agencies were confused about NLM's request, and despite Mr. Carlise [sic] [being] assigned to conduct" the review, "nothing in the record . . . show[s] that Mr. Carlise [sic] conducted this review." Pl.'s Reply at 2. Instead of Mr. Carlisle conducting the review, plaintiff asserts "we have a one-sentence email from Mr. Carlise's [sic] supervisor claiming that the SBA did review the material." *Id.* Vinsys suggests Mr. Carlisle's supervisor—Ms. Mackin—"clearly demonstrat[ed] her confusion over NLM's request" by instructing NLM on "how to request the review." *Id.* After NLM clarified its request "[a]fter hours on the 19th, . . . [s]omehow, by the next afternoon, the SBA conducted a review and made its determination. *Id.* Vinsys also proposes, given Ms. Mackin sent her one-sentence email on "[t]he Friday before Christmas," "Ms. Mackin's email was an attempt to close something out before the Holidays." *Id.* "Regardless of the intent or motivation," Vinsys insists "the bottom line is that there is no evidence that the SBA actually reviewed the information provided by NLM. *Id.*

The government argues, on December 6, 2024, NLM submitted its D&F-NRD to SBA, along with "two attachments to the D&F-NRD itself, the previous and the new SOWs." Gov't's MJAR at 27 (citing AR Tab 27f at 1048 (2019 Statement of Work), AR Tab 27g at 1095 (2024 Statement of Work), AR Tab 41c at 1589 (NLM's 27 November 2024 D&F NRD)) (other citations omitted). Then, "[o]n December 20, 2024, SBA emailed NLM and opined upon NLM's

D&F-NRD stating '[y]es, we consider this a new contract and a release is not required.'" *Id.*
(quoting AR Tab 41c  at 1590 (Email from SBA to NLM on 20 December 2024 at 1:46 p.m.
stating "[SBA] consider[s] this a new contract"), AR Tab 37 at 1177 (Email from NLM/HHS to
NIH on 20 December 2024 at 3:58 p.m. forwarding SBA's 20 December email to NIH)).  By
responding "'[y]es, we consider this a new contract and a release is not required' to NLM's
email request, the government argues SBA's response demonstrates three items.  *See id.* at 27
(citations omitted).  First, the email "reasonably implies that SBA reviewed, relied on, and
agreed with [NLM's D&F-NRD]."  *Id.*  Second, the email is evidence "SBA 'suppl[ied]
input,' . . . opining that NLM's requirement was new and a release from the 8(a) Program was
not required as one would be were the NLM proposing a follow-on requirement."  *Id.* at 27
(quoting Consolidation of Mentor-Protege Programs and Other Government Contracting
Amendments, 85 Fed. Reg. 66146, 66155 (Oct. 16, 2020); citing 13 C.F.R. §§ 124.3,
124.504(d)(1)).  Third, "given that SBA was reviewing NLM's determination that it was
competing a new requirement, SBA's one-line concurrence email was actually more – not less –
than what was required for NLM to proceed with the procurement."  *Id.* at 27–28 (citations
omitted).

    Having determined NLM was only required to submit a written notification with the
scope and dollar values of the previous procurement and the solicitation for new requirement
contracts, *see supra* Section VI.A; 13 C.F.R. § 124.504(d)(1), the Court now evaluates whether
the correspondences between NLM and SBA satisfy coordination and a submission of a written
notification under 13 C.F.R. § 124.504(d)(1).

    On 11 October 2024, NLM submitted an 8(a) program release request to SBA.  AR Tab
41 at 1468–69 (Email from NLM/NIH to SBA's DCbusdev8(a) email address on 11 October
2024 at 2:51 p.m. with NLM's 8(a) Program Release Request).  About two weeks later, SBA
confirmed receipt of the release request and assigned the request to an SBA Business
Opportunity Specialist in the Washington Metropolitan Area District Office.  AR Tab 41 at 1467
(Email from SBA Supervisory Business Opportunity Specialist to NLM/NIH on 29 October
2024 at 3:43 p.m. stating "I have assigned the release request to George Carlisle to review").
Then, on 18 November 2024, the Director of the Operations Division of HHS's Office of Small
and Disadvantaged Business Utilization emailed NIH's Small Business Program Manager with a
subject line of "Determination of New Requirement," a link to 13 C.F.R. § 124.504.  AR Tab 31
at 1164 (Email from HHS Director of Operations Division to NIH Small Business Program
Manager on 18 November 2024 at 3:07 p.m. solely stating "https://www.eC.F.R..gov/current/
title-13/section-124.504").  The Operations Director forwarded this email to the Deputy Director
of HHS's Business Utilization Office, who then sent an email to NIH personnel with a link to
§ 124.504, an explanation of which documents to send to SBA, a link to determine which SBA
District Office to send the documents to, and an attachment of a sample D&F.  AR Tab 31at
1163 (Email from HHS Director of Operations
Division to another HHS employee on 18 November 2024 at 3:07 p.m.), *id.* (Email from HHS to
NIH on 25 November 2024 at 11:59 a.m. including two links and a sample D&F).  This email
was forwarded to NLM (from HHS) on 25 November 2024.  AR Tab 31 at 1162–63 (Email from
NIH to HHS with NLM CC'd on 25 November 2024 at 12:05 p.m.).  NLM met with HHS the
same day, and two days later sent "the DF New Requirement Designation package to [HHS] for
review, prior to [NLM] sending to the SBA for official review."  *See* AR Tab 34 at 1171–72

(Email from NLM/NIH to NIH & HHS on 27 November 2024 at 12:01 p.m.). On 6 December 2024, HHS emailed NLM stating "[t]he D&F document and SOW attachments look ready for submission to the SBA." AR Tab 35 at 1173 (Email from HHS to NIH, HHS, and NLM on 6 December 2024 at 11:19 a.m.).

According to an email from NLM on 10 December 2024, NLM "withdr[e]w the subject 8(a) Program Release Request [which] le[ft] only the Determination of New Requirement-NLM that was submitted on 12/6/2024." AR Tab 41d at 1598 (Email from NLM to SBA Business Opportunity Specialist on 10 December 2024 at 2:51 p.m. noting a phone call regarding two requests to SBA and withdrawing the 8(a) release request); *see also* Tr. at 92:7–12. After some intervening confusion, on 11 December 2024, HHS clarified: "Originally, [NLM's] contracting office requested a release from the 8(a) program, but after [NLM's and HHS'] discussions last week, [HHS] advised [NLM] to withdraw that request and instead submit a request for a new requirement determination. . . . [HHS] attached the email that was sent out last Friday with the D&F and old and new SOW." AR Tab 41d at 1596 (Email from HHS to SBA on 11 December 2024 at 10:06 a.m.). A few follow-up and forwarded emails later, SBA's Deputy District Director for the Washington Metropolitan Area District Office asked NLM to resubmit the offer letter and SOW to another email address ("DCOfferletters@sba.gov") on 19 December, and HHS promptly responded to note it "will re-forward the information that was sent by the [contracting officer]." AR Tab 41d at 1593–94 (Emails between NLM and SBA, including Deputy District Director and Supervisory Business Opportunity Specialist, on 19 December 2024 at 9:56 a.m. and 10:12 a.m.). SBA then alerted NLM (and HHS) the same SBA Business Opportunity Specialist was assigned to NLM's new requirement email. AR Tab 41d at 1592–93 (Email from SBA Supervisory Business Opportunity Specialist to NLM on 19 December 2025 at 10:17 a.m. stating "I found the request, and this has been assigned to George Carlisle. . . ."). After the Business Opportunity Specialist did not act on the new requirement "for more than 7 business days," the Deputy District Director (in the same office as the Specialist) sent NLM (and HHS) via the "DCOfferletters@sba.gov" email address and asked NLM to submit a signed offer letter. AR Tab 41d at 1590–91 (Email from SBA Deputy District Director to NLM & HHS on 19 December 2024 at 3:16 p.m.). NLM/HHS clarified it was "not requesting the acceptance of an offer letter but rather . . . submitted documents for SBA to review in relation to a current 8(a) contract that is in the process of being recompeted," and was merely asking "SBA provide review of a D&F and applicable SOWs (old and new) in the determination." AR Tab 41d at 1590–91 (Email from NLM/HHS to SBA, including Deputy District Director and Supervisory Business Opportunity Specialist, on 19 December 2024 at 7:17 p.m.). The next day, on 20 December 2024, SBA responded: "Yes, we consider this a new contract and a release is not required." AR Tab 41d at 1590 (Email from SBA to NLM on 20 December 2024 at 1:46 p.m.).

These exchanges of emails and at least one phone call between SBA and NLM evince the back-and-forth required to constitute "coordination" between the agencies under 13 C.F.R. § 124.504(d)(1), so the dispositive inquiry is whether NLM provided written notification to SBA for this new requirement.[3] *See, e.g.*, AR Tab 41d at 1590–1600 (emails generally about new

---

[3] For the purposes of determining whether NLM complied with § 124.504(d)(1), the Court "assume[s] that the NRD memo was correct in its conclusion that it was a new requirement," given plaintiff agreed "yes, the Court can make that assumption." Tr. at 22:9–18. The Court will, in section VI, *infra*, analyze whether NLM deeming the solicitation as a new requirement was arbitrary and capricious.

requirement determination); AR Tab 41d at 1592–93 (email from HHS to SBA on 19 December 2024 at 10:22 a.m. noting "[t]he contracting officer spoke with [the SBA Business Opportunity Specialist"), 1596 (emails discussing a phone call between the NLM CO and the SBA Business Opportunity Specialist). On 6 December 2024, NLM submitted the D&F and the two SOWs to SBA and appears to have submitted it again to another email address on 19 December 2024. *See* AR Tab 41d at 1598 (Email from NLM/NIH to SBA Business Opportunity Specialist on 10 December 2024 at 2:51 p.m. noting after the 8(a) release was withdrawn, "this will leave only the Determination of New Requirement-NLM that was submitted on 12/6/2024"), AR Tab 41d at 1593–94 (Email from SBA to HHS on 19 December 2024 at 10:17 a.m. noting, after asking for NLM to submit the documentation to DCofferletters@sba.gov, SBA Supervisory Business Specialist noted "[she] found the request). SBA's Deputy District Director asked NLM to resubmit the document with a signature by the CO and on the agency letterhead. AR Tab 41d at 1591–93 (Email from SBA Deputy District Director to HHS stating: "I sent you an email through "DCofferletters@sba.gov" with attachments. Please submit a signed offer letter by contract officer on agency letterhead following the format within the attached document. Once received, we can move forward with processing."). This means SBA not only looked at the document but also noted errors in the document's formatting and formalities.[4] *See id.* More importantly, this email confirms SBA received written notification from NLM about the solicitation being deemed a new requirement. *See id.* After NLM's clarification that SBA need only review the D&F and applicable SOWs in the "determination that this recompete contract being defined as a new contract therefore will not be competed under the 8(a) program," SBA's Deputy District Director responded affirmatively, again showing receipt of the written notification. AR Tab 41d at 1590 (Email from SBA to NLM on 20 December 2024 at 1:46 p.m. stating "[SBA] consider[s] this a new contract"). When pressed at oral argument, plaintiff also admitted "there's an email that the SBA says [NLM] deemed it a new requirement." Tr. at 31:5–10; *see also* Tr. at 42:13–23 ("[THE COURT:] So in the Government's view, even if [NLM] had made the determination, so long as they sent the email to SBA, even if SBA didn't reply, SBA just said, you know, 'We appreciate your email and we trashed it,' you know, or 'We appreciate your email and perhaps even we disagree with it,' but so be it, we've been notified.' That would have been sufficient. [GOVERNMENT]: yes, if we get into the

---

[4] To be clear, plaintiff believes "SBA realized it never actually conducted the required analysis in December 2024" when SBA's Supervisory Business Opportunity Specialist sent an email to two Business Opportunity Specialists stating "[t]his looks like the review was not done for [NLM's D&F]. Start this review today"—this is incongruous with the requirements under 13 C.F.R. § 124.504(d)(1). *See* Pl.'s MJAR. at 5 (citing AR Tab 41 at 1456 (Email from Supervisory Business Opportunity Specialist on 7 February 2025 at 11:10 a.m. and 2:20 p.m. with subject line "8(a) Program New Contract Determination – 'Software Development, Operation, Maintenance, and Cloud Computing to Support'")). Given NLM need only provide written notification to SBA, SBA did not need to explain its required analysis in a response to NLM. 13 C.F.R. § 124.504(d)(1); *see supra* Section V.A. Further, plaintiff proclaims the SBA Deputy District Director giving the all-clear to NLM is "unreasonable" and "contrary to law" because "[she] was not the individual tasked with conducting this review" and her email "contains no analysis or examination." The SBA Deputy District Director, according to the government, "is quite senior and is more senior than [the Supervisory Business Opportunity Specialist]," who ostensibly supervises the Business Opportunity Specialist originally assigned to review NLM's D&F. *See* Pl.'s MJAR at 8; Tr. at 94:9–12. Given written notification to the SBA District Office is sufficient and because NLM provided written notification to the SBA District Office, and receipt of the notification was confirmed by the SBA Deputy District Director—who is significantly more senior than the employee assigned to review the case—NLM satisfied its duty to submit a written notification to SBA notwithstanding the "individual tasked with conducting th[e] review." *See* 13 C.F.R. § 124.504(d)(1); Pl.'s MJAR at 8; *supra* Section V.B.

disagreement, . . . that takes us over to 505(a)."). Given a procuring agency's new requirement determinations only require "coordination" with and written notification to SBA, and because SBA confirmed receipt of NLM's email with the D&F with the old and new SOWs to SBA after a two-month stint of correspondences and calls, NLM complied with its obligations under § 124.504(d)(1) to recompete a new requirement contract outside the 8(a) program.

Even if, as plaintiff argues, NLM were required to receive SBA's concurrence on the new requirement determination (which is the requirement for *follow-on* requirements), SBA's 20 December email also constitutes "concurrence." In its final clarification email on 19 December, NLM explicated it was "requesting SBA provide review of a D&F and applicable SOWs (old and new) in the determination that this recompete contract being defined as a new contract." AR Tab 41d at 1590 (Email from NLM/HHS to SBA on 19 December 2024 at 7:17 p.m.). In response to this email, SBA's Deputy District Director's unambiguous statement "Yes, we consider this a new contract and a release is not required" evinces two items. First, SBA agreed with the conclusion of NLM's analysis, which, according to Merriam-Webster and the parties, suffices for concurrence. Tr. at 33:7–34:9. Second, the deputy director previously reviewed the solicitation and identified formatting and signatory errors, indicating SBA analyzed the request before providing its concurrence. *Contra* Tr. at 71:1–6 ("[PLAINTIFF:] [T]here is nothing in the record to show that the SBA even read the document. In fact, there's documents in the record that reflects that the agency didn't read the -- or the SBA didn't read the agency's document."). As plaintiff acknowledges "a concurrence means I agree" with "some sort of detail" "reflective of whether or not [SBA] actually examined this," *see* Tr. at 33:7–34:9, and "could [be] one sentence" long, *see* Tr. at 34:15–21, given the SBA Deputy District Director agreed with NLM's decision to deem the solicitation a new contract and noted no 8(a) release was required after examining and providing feedback on the document, SBA went above-and-beyond to concur with NLM's determination after NLM provided a written request to remove the solicitation from the 8(a) program. *See* 13 C.F.R. § 124.504(d)(1).

In this protest, for the Court to set aside NLM recompeting the solicitation under a new requirement, plaintiff must prove "either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001); *id.* at 1333 (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)) ("When a challenge is brought on the second ground, the disappointed bidder must show 'a clear and prejudicial violation of applicable statutes or regulations.'"). Given NLM complied with 13 C.F.R. § 124.504(d)(1) by coordinating and providing written notification—and considering SBA went above-and-beyond by providing a concurrence agreeing the solicitation was "new contract and a release is not required"—NLM did not violate any regulation or procedure. *See Impresa*, 238 F.3d at 1332; AR Tab 41d at 1590 (Email from SBA to NLM on 20 December 2024 at 1:46 p.m. stating "[SBA] consider[s] this a new contract").

## V.    Whether NLM Acted Arbitrarily and Capriciously By Deeming RFQ 1740009 A New Requirement

Having reviewed the regulation's requirements for SBA's level of review for removing procurements from the 8(a) set-aside program and finding NLM complied with the regulation by

providing written notification to SBA, the Court now considers whether NLM deeming RFQ 1740009 as a new requirement was arbitrary and capricious. In doing so, the Court reviews whether NLM's D&F provides sufficient rationale to support its requirement determination, in addition to plaintiff's new oral argument points regarding: (1) the solicitation's task orders' being too similar to the preceding solicitation's task orders; (2) certain task orders in the present solicitation being optional; (3) the solicitation's price not satisfying the inflationary component of the regulation; and (4) the agency deeming the solicitation a new requirement soon after voluntarily dismissing the GAO protest. The Court then reviews the parties' briefing to determine whether plaintiff waived its contention RFQ 1740009 was similar to the prior task order and thus not a new requirement.

A.    **Whether NLM Provided Sufficient Rationale To Show RFQ 1740009 Is "Different Enough" From The Previous Procurement**

At oral argument, plaintiff argued for the first time the NLM did not provide enough information in its D&F to deem RFQ 1740009 a new requirement. *See* Tr. at 52:17–53:9; 54:6–55:20. Plaintiff argued RFQ 1740009's task orders, including the task order seeking a contractor to *operate* (in place of creating and maintaining) cloud services were not new and instead very similar to the original contract. Tr. at 54:6–12. Second, plaintiff argued additional new tasks raised by the Court were "optional tasks" and summarized by stating, "I don't know if you could substantively say throwing on optional tasks onto a statement of work is enough to elevate it to a new." Tr. at 55:1–14. Third, plaintiff argued the increase in costs associated with the RFQ did not take inflationary factors into account, and if they had included inflation growth between 2019 and 2023, then the percentage increase would not have been enough to constitute a new contract under 13 C.F.R. § 124.504(d). Tr. at 66:13–16; *see also* Tr. at 52:19–25 ("[PLAINTIFF:] I don't recall seeing an inflationary comparison in the scope."). Plaintiff acknowledged he "had not done the math" on this point, nor was it briefed. Tr. at 77:17–19. Plaintiff also admitted, when asked at oral argument whether plaintiff "agree[d] that . . . the contracting officer's memo is detailed, lengthy, and [it has] no reason to dispute it," "[y]es, it is detailed, and [the CO] clearly analyzed the two SOWs. Tr. at 36:17–21.

The government contended NLM provided sufficient rationale to show the previous procurement and the solicitation were different enough to constitute a new requirement contract. *See* Tr. at 17:15–18:5; 43:17–22. The government argued the solicitation contained several new tasks and "the [D&F] goes through the specific tasks that have changed[, and] talks a lot about certain tasks that are brand new that were not in the prior contract[, such as] cloud computing [and] artificial intelligence." Tr. at 51:16–25. "[B]y way of one example, Task 4.5 – Cloud Architect and Migration is an entirely new task when comparing the statements of work from the new requirement and the prior requirement. The focus of cloud computing "has shifted from simply migrating to the cloud to fully optimizing cloud applications to leverage the technology's full potential" including the use of artificial intelligence/machine learning." Gov't's MJAR at 12 (citing AR Tab 41c at 1582 (NLM's 27 November 2024 D&F NRD)). Next, the government asserts, given "a price of $36,849,211.49 represents a 32% increase over the prior requirement," this increase satisfies the regulation's non-dispositive requirement for a 25% price increase in 13 C.F.R. § 124.504(c)(ii)(c). Gov't's MJAR at 3–4, n.1, 12–13; *see* Tr. at 66:19–24.

13 C.F.R. §§ 124.3 and 124.504 are instructive in determining whether a requirement is follow-on or new.  First, 13 C.F.R. § 124.3 (entitled "What definitions are important in the 8(a) BD program?") furnishes a definition for "Follow-on requirement or contract":

> The determination of whether a particular requirement or contract is a follow-on includes [(1)] consideration of whether the scope has changed significantly, requiring meaningful different types of work or different capabilities; [(2)] whether the magnitude or value of the requirement has changed by at least 25 percent for equivalent periods of performance; and [(3)] whether the end user of the requirement has changed.

13 C.F.R. § 124.3.  "[I]f the procurement satisfies at least one of these three conditions, it may be considered a new requirement," but "if the requirement satisfies none of these conditions, it is considered a follow-on procurement."  *Id.*  The definition further clarifies "meeting any one of these conditions is not dispositive that a requirement is new.  In particular, the 25 percent rule cannot be applied rigidly in all cases."  *Id.*  The parties agreed at oral argument these factors are disjunctive, and plaintiff further admitted the factors establish a "sliding scale."  Tr. at 67:5–10 ("[GOVERNMENT:]  These elements that . . . the procuring agency is supposed to analyze are not conjunctive, but d[i]sjunctive."); Tr. at 68:11–15 ("[PLAINTIFF:]  I do agree with [the government] that it is d[i]sjunctive, and there's opinions from this Court out here that says . . . even when this gets back to this sliding scale, everything i[s] a totality.").

Section 124.504 is consistent with the definition provided in Section 124.3.  As a threshold matter, § 124.504(c)(ii) notes "[a] new requirement is one which has not been previously procured by the relevant procuring activity."  Like the 25% price increase requirement in Section 124.3, Section 124.503(c)(ii)(C) states "[t]he expansion or modification of an existing requirement may be considered a new requirement where the magnitude of change is significant enough to cause a price adjustment of at least 25 percent (adjusted for inflation) or to require significant additional or different types of capabilities or work."  Section 124.3 also identifies "[p]rocurements for construction services . . . are generally deemed to be new requirements[, but] recurring indefinite delivery or indefinite quantity task or delivery order construction services are not considered new."

Having identified the factors relevant for determining whether a contract is new or a follow-on, the Court turns to NLM's D&F in evaluating whether the D&F provided sufficient rationale when deeming RFQ 1740009 as a new requirement.  In support of the first factor regarding "consideration of whether the scope has changed significantly, requiring meaningful different types of work or different capabilities," on page 4 of its D&F, the contracting officer noted "over the past 5 years, the scope of work and the underlying technologies have evolved significantly, leading to project requirement evolvement, and NLM missions" and detailed nearly nine pages of new tasks or modifications to previous tasks. AR Tab 41c at 1577 (NLM's 27 November 2024 D&F NRD).  As a first example, the contracting officer identified—and plaintiff agreed at oral argument—task orders that are not in the 2019 solicitation.  *See id.*  Plaintiff agreed, "looking at the statement of work, the fourth-to-last bullet point in the 2025 solicitation, 'Domain Knowledge and Understanding of Healthcare Standards, Terminologies, and Medical Vocabulary" is not in the 2019 solicitation.  Tr. at 56:12–18.  When asked if "[t]he next bullet

point, 'Understanding the Prime Cloud Service Providers and in-Depth Knowledge of the Core Services and Offerings Provided By the Cloud Platforms,' [was] in the 2019 [Solicitation,]" plaintiff acknowledged "[i]t is not spelled out in that manner." Tr. at 56:23–24. Plaintiff's answer was the same for the next bullet point: for "[t]he third . . . bullet point, the practical experience using cloud management consoles," when asked if "that's not in the 2019 statement of work," plaintiff again acknowledged "[n]ot specifically in that manner, no." Tr. at 57:6–11.

As another example related to the analysis of the first factor, on at least pages 8 and 14 of the D&F, NLM identified the task orders now incorporate use of artificial intelligence ("AI"). *See* AR Tab 41c at 1581–87 (NLM's 27 November 2024 D&F NRD). In Task Orders 4.2 and 4.3 (generally related to informational technology management), the contracting officer noted the "the rapid adoption of AI . . . has prompted OCCS to evolve its DevOps practices[, such as by using] AI-assisted coding tools like GitHub CoPilot[,] . . . evaluations of frameworks for managing, securing, training, and deploying AI models in compliance with Federal guidelines[, and] explor[ing] AIOps platforms to enhance IT Service Management (ITSM) practices." AR Tab 41c at 1581 (NLM's 27 November 2024 D&F NRD). In Task Order 4.5—"a new task listed in the SOW" (related to Cloud Architect and Migration)—the contracting officer distinguished from "[f]ive years ago, [when] most enterprises were in the early to mid-stages of cloud adoption, with hybrid and multi-cloud strategies just beginning to gain traction," to "[n]ow [where] cloud technology is more mature and widespread[, and] Advanced services like serverless computing, edge computing, and *Artificial Intelligence (AI)/ Machine Learning (ML)-as-a-service are now integral to cloud platforms*. AR Tab 41c at 1582 (NLM's 27 November 2024 D&F NRD) (emphasis added). In Task Order 4.8 (related to digital data analysis and visualization), the contracting officer noted "the volume, complexity, and diversity of data have grown, . . . [and] [t]he rise of artificial intelligence (AI), and big data technologies has enabled the NLM/OCCS to extract deeper insights from biomedical data, user interactions, and operational systems." AR Tab 41c at 1586 (NLM's 27 November 2024 D&F NRD). Specifically, one of the new tasks under Task Order 4.8 included "Use of Artificial Intelligence platforms, particularly large language models, for more efficient segmentation of customer feedback to help NLM product owners make business decisions." AR Tab 41c at 1587 (NLM's 27 November 2024 D&F NRD). When asked at oral argument whether the prior contract included any task orders involving AI, "[plaintiff] concede[d] that . . . there was no AI in any federal contracts in 2019." Tr. at 59:12–14.

As other examples regarding the first factor, the contracting officer noted, under at least Task Orders 4.1, 4.4, 4.6, and 4.8, new tasks or requirements incorporated in past task orders. Under Task Order 4.1, the contracting officer identified "enhancement of the TS-Repository," "optimizing the Web Portal for users to submit and manage requests for loading data to the TS Repository, viewing the Quality Assurance report, generating through the automated ETL process of the request, and accept (or reject) the data loading for downstream consumption; providing API calls and Export files for downstream applications (such as EHR Systems) to retrieve terminology data in the repository[, and] implementing Continuous Release feature" as examples of new requirements to the TS-Repository. AR Tab 41c at 1578–79 (NLM's 27 November 2024 D&F NRD). In the same task order, the contracting officer also noted NLM's changes to "the Clinical Health Quality Measures framework ("eCHQM") in the FHIR Platform within the TS-Repo," which involves "[s]ome new tasks/requirements includ[ing:]

providing Pre-rulemaking measures support in eCQM annual update release by enhancing eCQM downloadable files and Search Value Sets UI to highlight pre-rulemaking measures;

enhancing value set comparison options by adding code set comparison between versions of a measure by further developing comparison UI to compare all codes in measures and generate comparison reports, and ensuring VSAC UI and Comparison UI to easily select versions of measure to compare;

developing additional program release (EH) based on FHIR measures; migrating Race and Ethnicity value sets to use CMS identified CDCREC version;

implementing and supporting QI-Core STU 6.0.0; performing Manifest create and update operations using FHIR API; implementing Value Set Intensional filters based on LOINC parts and based on RxNorm's drug ingredient (TTY), and more.

AR Tab 41c at 1579 (NLM's 27 November 2024 D&F NRD).  In Task Order 4.5 (related to cloud architect and migration), the contracting officer contrasted the previous tasks where "the focus was primarily on 'lift-and-shift' strategies[, involving] moving existing applications and infrastructure directly to the cloud with minimal modifications . . . to reduce on-premise infrastructure costs and take advantage of cloud scalability" to the new requirements in RFQ 1740009 where "the focus of cloud adoption has shifted from simply migrating to the cloud to fully optimizing cloud applications to leverage the technology's full potential."  AR Tab 41c at 1582 (NLM's 27 November 2024 D&F NRD).  Specifically, the contracting officer recognized seven new types of modifications to the previous task order:  harnessing modern cloud features; refactoring for cloud-native efficiency; prioritizing continuous optimization; guiding cloud modernization; implementing cloud cost management; automating cloud onboarding processes; and enhancing operational service management.  AR Tab 41c at 1582–83 (NLM's 27 November 2024 D&F NRD).  Plaintiff's counsel, relying on his experience "work[ing] in-house in an IT company," asserted at oral argument "the 2019 [statement of work] did require the contractor to be able to migrate services to the cloud," and "to say that it's a new requirement to do cloud work in 2025 is, [he] [thought], inaccurate.  The 2019 statement of work has cloud in multiple places in there, and one of the things the agency is hanging its hat on substantively new is that there's new cloud requirements, but, again, you can't migrate to the cloud if you don't know how to operate a cloud."  Tr. at 54:14–23, 56:19–24, 59:18–22; *see also* Tr. at 60:13–16 (arguing cloud technology is "part of the evolving technology between 2019 and 2025," with the 2019 statement of work serving as a "snapshot" of the technology).  Implicit in plaintiff's assertion is the differentiation between cloud migration and cloud operation; the contracting officer admitted the focus and goals of the cloud migration under the 2019 contract "have shifted from simply migrating to the cloud to fully optimizing cloud application to leverage the technology's full potential."  AR Tab 41c at 1582 (NLM's 27 November 2024 D&F NRD).  This "shift" from migration to fully optimization, in addition to the seven new types of tasks in the RFQ 1740009, demonstrates pre-existing task orders were modified in RFQ 174009.

The contracting officer's compare-and-contrast between the 2019 statement of work and RFQ 1740009 comprised a robust analysis of the differences between the two solicitations.  First, the contracting officer analyzed the change in the scope of work—and plaintiff agreed RFQ 174009 did not exactly match the previous solicitation.  Next, the contracting officer and plaintiff

also agreed the inclusion of AI was not included in the previous contract. Finally, the contracting officer distinguished specific modifications to pre-existing task orders, such as the cloud migration task order, and provided a description of why the agency changed its focus on cloud technology between 2019 and 2025. Considering the regulation requires an analysis of "whether the scope has changed significantly, requiring meaningful different types of work or different capabilities" and because the contracting officer analyzed the scope of work and explained why the scope of work, the task orders, and the modifications to pre-existing task orders in the D&F, the first factor of 13 C.F.R. § 124.3 militates in favor of NLM properly providing sufficient rationale in deeming RFQ 1740009 as a new requirement.

Under the second factor under 13 C.F.R. § 124.3—"whether the magnitude or value of the requirement has changed by at least 25 percent for equivalent periods of performance"—the contracting officer provided, on pages 14–16, a breakdown of costs by labor category, the number of hours which will be required by the task, and the amount of dollars allocated for each task, as compared to the 2019 solicitation. AR Tab 41c at 1587–89 (NLM's 27 November 2024 D&F NRD). In total, NLM estimated RFQ 174009 was valued at $49,349,211.53, whereas the 2019 Solicitation was valued at $21,516,219.77. AR Tab 41c at 1588 (NLM's 27 November 2024 D&F NRD). The value of the 2025 Solicitation was therefore "a 77% increase from the previous requirement award."[5] *Id*. Given 13 C.F.R. § 124.3 only requires a 25% increase for a requirement to be deemed a new requirement, RFQ 1740009's 77% increase further militates in favor of NLM properly providing sufficient rationale to deem the RFQ as a new requirement.

Finally, under the third factor regarding "whether the end user of the requirement has changed," the government confirmed at oral argument the end user has not changed. *See* Tr. at 64:23–65:5. Given the end user remains the NIH, this factor does not weigh in favor of the Solicitation being a new requirement. *See* 13 C.F.R. § 124.3.

In providing a sixteen-page memorandum detailing the changes in scope of work between the 2019 and 2025 statements of work and calculating the price adjustment of 77% (which is above 25%) in accordance with factors one and two of 13 C.F.R. § 124.3, NLM provided sufficient rationale and complied with the controlling regulations in concluding the RFQ was a new requirement. The Court, in considering whether NLM acted arbitrarily and capriciously, must "sustain an agency action evincing rational reasoning and consideration of relevant factors," *Adv. Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)), and ensure it does not "substitute its judgment" for

---

[5] Plaintiff posits RFQ 147009 includes an optional task in the contract which is "not a required task in the contract," so the value of the contract should not include the value of the optional task, meaning the RFQ is only valued at $36 million. *See* Tr. at 65:24–66:16. The government argues, even if plaintiff was correct, $36 million is around a 32 percent increase from the 2019 contract. *See* Tr. at 62:2–13. In response to the government, plaintiff stated "the price comparison and scope is supposed to be detailed and indexed to an inflation, which those of us who shopped at a grocery, in 2022 and 2023 know inflation was pretty high[, and] [plaintiff] do[es]n't recall seeing an inflationary comparison in the scope." Tr. at 52:19–25. When asked what value plaintiff proffers as the actual value of the RFQ after "exclud[ing] the optional work . . . calculat[ing] for inflation," plaintiff admitted "[it] didn't do the math numbers." Tr. at 67:17–20. Neither did the government. Tr. at 67:5–9 ("[GOVERNMENT:] I have not performed it"). Given the administrative record was silent on this matter and neither party calculated any of the values associated with plaintiff's new inflation argument, the values relevant for the analysis under the second factor are limited to those included in the administrative record (and in NLM's D&F).

the agency's so long as the agency's decision was reasonable,[6] *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 998–99 (Fed. Cir. 2018) (quoting *R & W Flammann GmbH v. United States*, 339 F.3d 1320, 1322 (Fed. Cir. 2003)).  As NLM sufficiently analyzed factors one and two under 13 C.F.R. § 124.3 in its D&F—"evincing rational reasoning and considering of relevant factors"—and arrived at a reasonable conclusion that the RFQ was a new requirement, NLM did not act arbitrarily and capriciously (and the Court will not "substitute its judgment" related thereto) in determining RFQ 174009 is a new requirement.  *Adv. Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc.*, 419 U.S. at 285; *Dell Fed. Sys., L.P.*, 906 F.3d at 998–99 (quoting *R & W Flammann GmbH*, 339 F.3d at 1322.

### B.    Whether Plaintiff Waived Its Argument About the Sufficiency of NLM's New Requirement Determination

Notwithstanding NLM providing sufficient rationale to deem RFQ 1740009 a new requirement in its D&F, the Court also reviews whether plaintiff waived its argument contesting the NLM's determination as arbitrary and capricious.  "[A]rguments not raised in the opening brief are waived."  *See Homeland Sec. Sols., Inc. v. United States*, 162 Fed. Cl. 535, 546 (2022) (quoting *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006)); *see also Novosteel SA v. United States, Bethlehem Steel Corp.*, 284 F.3d 1261, 1273 (Fed. Cir. 2002) (holding appellant "failed to preserve this issue for [appellate] review, for it waived [an] argument by not presenting it in the principal summary judgment brief filed with [trial court]").  At oral argument, when asked whether plaintiff contends NLM's new requirement determination was arbitrary and capricious, plaintiff replied "I did not make that argument, no."  Tr. at 69:1–2.  Plaintiff also acknowledged, after introducing its inflation argument at oral argument, plaintiff "didn't do the math numbers" to calculate whether the solicitation would satisfy the regulation.  Tr. at 67:17–20.  Critically, when asked whether plaintiff "agree[d] that . . . the contracting officer's memo is detailed, lengthy, and you have no reason to dispute it," plaintiff admitted "Yes, it is detailed, and he clearly analyzed the two SOWs. Yes, Your Honor."  Tr. at 36:17–21.  The government indicated "plaintiffs have not engaged with [this argument] or challenged it, and so [the government] believes that's clear, that it is a new requirement."  Tr. at 51:1–7.  The government believed "it's all irrelevant," considering: (1) "[plaintiff] said . . . he's not technically qualified to comment on any of these technical issues, and so [the government] think[s] [plaintiff's counsel's] testimony, to the extent the lawyer can make testimony, is irrelevant[; (2)] it's not in the Administrative Record[, and (3)] none of it was argued in any of the briefing."  Tr. at 61:9–16.  Given plaintiff did not raise its arguments regarding the sufficiency of NLM's D&F in its opening brief and did not raise the arguments until oral argument (and because plaintiff agrees with the Court that the D&F is detailed and plaintiff has no reason to dispute it), even if the Court found the D&F had not supplied sufficient rationale under 13 C.F.R. § 124.3, plaintiff's argument is waived.  *See Homeland Sec. Sols., Inc.*, 162 Fed. Cl. at 546 (quoting *SmithKline Beecham Corp.*, 439 F.3d at 1319; *see also Novosteel SA*, 284 F.3d at 1273.

---

[6] Plaintiff also acknowledges procuring agencies retain discretion in determining changes in scope of work, which may be a dispositive factor in bid protests.  *See* Tr. at 21:11–17 ("I'll be, you know, frank.  If we get into arguments on whether or not the Government is wrong in how it's changing the scope of work, I am probably not winning the protest. . . [I]f the Government gets enough discretion in substantive areas like that, . . . I didn't think it was the right argument for me to make.")

## VI.    Whether Plaintiff is Entitled to Permanent Injunctive Relief

The Court finally turns to plaintiff's requested relief: enjoining NLM from removing RFQ 1740009 from the 8(a) set-aside program. "As an experienced IT government contractor in the 8(a) business program, Vinsys [argues it] . . . will be irreparably harmed by removing this opportunity from the 8(a) business program." Pl.'s MJAR. at 9–10.

In determining whether to issue a permanent injunction, the Court considers: "(1) whether . . . the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief." *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004).

Given NLM properly provided written notification to SBA with its new requirement determination before recompeting the solicitation outside the 8(a) program and because NLM did not act arbitrarily and capriciously by deeming the solicitation as a new requirement, plaintiff has not succeeded on the merits of its case. *See supra* Sections V–VI. As a result, plaintiff is not entitled to a permanent injunction enjoining NLM from removing RFQ 1740009 from the 8(a) set-aside program. *PGBA*, 389 F.3d at 1229.

## VII.    Conclusion

For the foregoing reasons, plaintiff Vinsys IT Hub LLC's Motion for Judgment on the Administrative Record, ECF No. 14, is **DENIED** and the government's Cross-Motion for Judgment on the Administrative Record, ECF No. 17, is **GRANTED**. The Clerk is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge

- 24 -